No. 24-70003

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

_____

OBEL CRUZ-GARCIA,

*Petitioner-Appellant*

v.

BOBBY LUMPKIN, Director, Texas Department of Criminal Justice,
Correctional Institutions Division,

*Respondent-Appellee*

_____

On Appeal from the United States District Court for the Southern
District of Texas, Houston Division, No. 4:17-CV-3621

_____

## MOTION FOR CERTIFICATE OF APPEALABILITY AND BRIEF IN SUPPORT

Jeremy Schepers
Supervisor, Capital Habeas Unit

Naomi Fenwick
Assistant Federal Defender

David Currie
Assistant Federal Defender

Federal Public Defender's Office
Northern District of Texas
525 South Griffin Street, Ste. 629
Dallas, Texas 75202
214.767.2746
214.767.2886 (fax)
jeremy_schepers@fd.org
naomi_fenwick@fd.org
david_currie@fd.org

## STATEMENT REGARDING ORAL ARGUMENT

Cruz-Garcia has shown that the included issues should be certified for appeal and set for full merits briefing and oral argument.

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT ..................................ii

TABLE OF CONTENTS ....................................................... iii

TABLE OF AUTHORIES....................................................vii

MOTION FOR CERTIFICATE OF APPEALABILITY ...........................1

BRIEF IN SUPPORT OF MOTION FOR CERTIFICATE OF APPEALABILITY..................................................................2

STANDARD OF REVIEW...................................................2

STATEMENT OF FACTS ....................................................4

    I.    Background regarding offense and initial investigation..............4

        A.  Cruz-Garcia was originally from the Dominican Republic and came to Houston via Puerto Rico. ...........................4

        B.  In September 1992 Angelo was abducted and killed. ............6

        C.  The evidence was tested by the HPD Crime Lab and Genetic Design...................................................7

        D.  The HPD Crime Lab was closed due to incompetence............8

        E.  The DNA evidence was retested. ............................9

        F.  The State later admitted that its DNA analysis was seriously flawed. ..............................................10

        G.  In Puerto Rico, Cruz-Garcia became a devout Christian after being incarcerated. .............................11

        H.  As Santana's mental health worsened, he implicated Cruz-Garcia. .....................................................14

        I.  Cruz-Garcia was appointed counsel who maintained an unmanageable workload.......................................15

    II.   The Trial .......................................................17

        A.  Jury Selection (June 3 to June 17): Cornelius bills over 50 hours to other cases. ............................................17

        B.  Hearing on the Motion to Suppress DNA Evidence (June 19): Cornelius continues to bill extensively to other cases. .........18

C. The court's ruling (July 3): Cornelius spends nearly all his time on other cases as the court precludes the defense from presenting any evidence of the HPD Crime Lab scandal or the prior testing. ....................................................19

D. Guilt phase day 1 (July 8): Cornelius bills 4 hours to other cases as the State presents four witnesses...........................20

E. Guilt phase day 2 (July 9): Cornelius bills 5.5 hours to other cases as the State presents seven additional witnesses. ......21

F. Guilt Phase day 3 (July 10): Cornelius bills 4 hours to other cases while waiving his cross-examination of Santana and admitting that he never reviewed the State's file................21

G. Guilt phase day 4 (July 11): Cornelius bills 4 hours to other cases while flubbing another opportunity to cross Santana and failing to challenge the DNA evidence. ..........................24

H. Guilt phase day 5 (July 12): Cornelius again bills 4 hours to other cases despite an all-day charge conference..................27

I. Guilt phase day 6 (July 15): Cornelius bills 2.25 hours to other cases as the State emphasizes the DNA evidence.......27

J. Punishment phase day 1 (July 16): Cornelius bills over 6 hours to other cases and appears in court in another case as a State witness reveals Cruz-Garcia was a confidential informant..................................................................................28

K. Punishment phase day 2 (July 17): Cornelius bills over 3 hours to other cases as Santana implicates Cruz-Garcia in the murder of Saul Flores. ...................................................29

L. Punishment phase day 3 (July 18): Cornelius bills 5.5 hours to other cases while presenting essentially no case in mitigation. ...............................................................................33

M. Punishment phase day 4 (July 19): The jury breaks a deadlock after the foreman reads Bible passages concerning the death penalty to the jury................................................34

III. Motion for a New Trial..............................................................37

IV. Post-trial proceedings .................................................................38

A. Direct appeal.........................................................................38

iv

     B.  State Habeas Proceedings ......................................................38

        1.  The State partially recanted its DNA analysis. ..............38

        2.  After losing her reelection bid, the trial judge compressed the state habeas process...................................................39

     C.  Federal District Court and Subsequent State Court Proceedings. ..........................................................................40

ARGUMENT ......................................................................................41

  I.   This Court should grant COA on the external influence claim. 41

     A.  Cruz-Garcia alleged a substantial claim. .............................41

     B.  Cruz-Garcia raised a Sixth Amendment claim on direct appeal and in state habeas...................................................43

     C.  Reasonable jurists could debate the district court's denial of this claim...................................................................................44

        1.  Reasonable jurists could debate the district court's determination that the CCA adjudicated Cruz-Garcia's claim on the merits. ..................................................45

        2.  Reasonable jurists could debate the district court's application of § 2254(d)(1). ...............................................46

        3.  The district court incorrectly deferred to state court fact finding. ...........................................................................49

     D.  This claim should be remanded for an evidentiary hearing. 54

  II.   The Court should grant a COA on the IATC claim. ...................55

     A.  Cruz-Garcia alleged a substantial claim. .............................55

        1.  Failure to retain a DNA expert.......................................56

        2.  Failure to investigate and challenge future dangerousness..................................................................58

        3.  Failure to investigate State witnesses. ...........................60

        4.  Failure to retain a mitigation specialist and conduct an adequate mitigation investigation. ...................................62

     B.  Reasonable jurists could debate the district court's procedural adjudication.......................................................64

1. The district court erred in requiring Cruz-Garcia to establish both that § 2254(d) was met and cause and prejudice. .......................................................... 65

2. Reasonable jurists could debate the district court's § 2254(d) adjudication. ....................................... 66

III. The Court should grant COA on the complete defense claim. ... 75

A. Cruz-Garcia alleged a substantial claim. ............................. 75

B. Reasonable jurists could debate the district court's holding that the claim was adjudicated on the merits by the state court. ...................................................................... 78

C. Reasonable jurists could debate the district court's adjudication that the claim is meritless. ............................... 80

CERTIFICATE OF SERVICE ................................................... 83

CERTIFICATE OF COMPLIANCE ......................................... 83

# TABLE OF AUTHORIES

**Federal Cases**                                                      **Page(s)**

*Allen v. Vannoy,*
659 F. App'x 792 (5th Cir. 2016) ..................................................... 46, 47

*Andrus v. Texas,*
590 U.S. 806 (2020) .......................................................... 62, 70, 74

*Barefoot v. Estelle,*
463 U.S. 880 (1983) ..................................................................... 2

*Barnes v. Joyner,*
751 F.3d 229 (4th Cir. 2014) .................................................. 50, 54

*Brumfield v. Cain,*
576 U.S. 305 (2015) ................................................................... 67

*Buck v. Davis,*
580 U.S. 100 (2017) ..................................................................... 2

*Chambers v. Mississippi,*
410 U.S. 284 (1973) ................................................................... 78

*Coleman v. Thompson,*
501 U.S. 722 (1991) ................................................................... 51

*Crane v. Kentucky,*
476 U.S. 683 (1986) ................................................................... 78

*Cruz-Garcia v. Texas,*
578 U.S. 908 (2016) ................................................................... 38

*Cullen v. Pinholster,*
563 U.S. 170 (2011) .......................................................... 53, 66, 73

*Elmore v. Ozmint,*
661 F.3d 783 (4th Cir. 2011) ..................................................... 69

*Gray v. Epps,*
616 F.3d 436 (5th Cir. 2010) ..................................................... 67

*Halprin v. Davis,*
911 F.3d 247 (5th Cir. 2018) ..................................................... 54

*Harrington v. Richter,*
562 U.S. 86 (2011) .................................................................... 45, 68, 71

*Holmes v. South Carolina,*
547 U.S. 319 (2006) ....................................................................... 75, 77

*Johnson v. Williams,*
568 U.S. 289 (2013) ......................................................................*passim*

*Kittelson v. Dretke,*
426 F.3d 306 (5th Cir. 2005) ................................................................ 76

*Lucio v. Lumpkin,*
987 F.3d 451 (5th Cir. 2021) (en banc) ................................................ 53

*Mask v. McGinnis,*
233 F.3d 132 (2d Cir. 2000) ................................................................. 50

*Mattox v. United States,*
146 U.S. 140 (1892) ..................................................................... 41, 48

*McGregor v. Gisbson,*
248 F.3d 946 (10th Cir. 2001) .............................................................. 51

*Miller-El v. Cockrell,*
537 U.S. 322 (2003) ............................................................................. 3

*Moore v. Johnson,*
194 F.3d 586 (5th Cir. 1999) ................................................................ 72

*Murphy v. Davis,*
901 F.3d 578 (5th Cir. 2018) ................................................................ 51

*Nelson v. Davis,*
952 F.3d 651 (5th Cir. 2020) ..........................................................*passim*

*Nelson v. Lumpkin,*
72 F.4th 649 (5th Cir. 2023) ........................................................... 65, 66

*Oliver v. Quarterman,*
541 F.3d 329 (5th Cir. 2008) ..........................................................*passim*

*Panetti v. Quarterman,*
551 U.S. 930 (2007) ........................................................................... 50

*Parker v. Gladden,*
385 U.S. 363 (1966) ................................................................. 41, 44, 48

viii

*Pena-Rodriguez v. Colorado,*
580 U.S. 206 (2017) ...................................................................... 47, 48

*Remmer v. United States,*
347 U.S. 227 (1954) ....................................................................*passim*

*Rhines v. Weber,*
544 U.S. 269 (2005) ............................................................................ 40

*Salazar v. Dretke,*
419 F.3d 384 (5th Cir. 2005) ................................................ 46, 47, 48

*Slack v. McDaniel,*
529 U.S. 473 (2000) .............................................................................. 2

*Soffar v. Dretke,*
368 F.3d 441 (5th Cir. 2004) ............................................................. 72

*Souffer v. Trammell,*
738 F.3d 1205 (10th Cir. 2013) ................................................... 50, 55

*Strickland v. Washington,*
466 U.S. 668 (1984) ................................................................ 55, 56, 69

*Turner v. Louisiana,*
379 U.S. 466 (1965) ................................................................ 41, 44, 48

*United States v. Scheffer,*
523 U.S. 303 (1998) ............................................................................ 76

*Wiggins v. Smith,*
539 U.S. 510 (2003) ....................................................................*passim*

*Williams v. Quarterman,*
551 F.3d 352 (5th Cir. 2008) ............................................................. 52

*Wilson v. Sellers,*
584 U.S. 122 (2018) ............................................................................ 69

## State Cases

*Hardeman v. State,*
868 S.W.2d 404 (Tex. App.—Austin 1993, pet. dism'd) .................... 25, 29

## Federal Statutes

28 U.S.C. § 2253(c) .......................................................................... 1, 2

28 U.S.C. § 2254(d) ............................................................................*passim*

**Rules**

Tex. R. Evid. 606(b) ...................................................................... 43, 45, 46

TEX. R. EVID. 613............................................................................... 30

**Constitutional Provisions**

U.S. CONST. amend. VI .....................................................................*passim*

# MOTION FOR CERTIFICATE OF APPEALABILITY

Petitioner-Appellant Obel Cruz-Garcia respectfully requests a certificate of appealability ("COA") pursuant to 28 U.S.C. § 2253(c) because he has made a substantial showing that his constitutional rights were violated. He requests a COA to appeal the district court's denial of three claims: (1) the jury was exposed to an external influence in violation of the Sixth Amendment; (2) ineffective assistance of trial counsel ("IATC") in violation of the Sixth Amendment; and (3) a violation of the right to present a complete defense in violation of Due Process.

## BRIEF IN SUPPORT OF MOTION FOR CERTIFICATE OF APPEALABILITY

Obel Cruz-Garcia requests a COA to appeal the district court's denial of three claims. This briefing supports Cruz-Garcia's Motion for COA and is directed at making that showing; it is not intended as briefing on the merits of appellate issues created by the district court's judgment.

## STANDARD OF REVIEW

To appeal the denial of a habeas petition, the petitioner must first obtain a COA. 28 U.S.C. § 2253(c). A COA should issue when the applicant demonstrates "a substantial showing of the denial of a constitutional right." *Id.* This requirement serves "to prevent frivolous appeals." *Barefoot v. Estelle*, 463 U.S. 880, 892 (1983). For a claim decided on the merits, a COA should issue if "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). For a claim denied on procedural grounds, a COA should issue if "jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.* at 484.

The COA determination is a "threshold" inquiry that "is not coextensive with a merits analysis." *Buck v. Davis*, 580 U.S. 100, 115

(2017). The Supreme Court has made clear that this "threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims" and, "[i]n fact, the statute forbids it." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003). The COA standard is "less burdensome in capital cases, as in a death penalty case any doubts as to whether a COA should issue must be resolved in the petitioner's favor." *Nelson v. Davis*, 952 F.3d 651, 658 (5th Cir. 2020) (internal quotations omitted).

# STATEMENT OF FACTS

## I. Background regarding offense and initial investigation.

### A. Cruz-Garcia was originally from the Dominican Republic and came to Houston via Puerto Rico.

In 1992, Cruz-Garcia[1] lived with his wife Angelita Rodriguez in the Houston area. Both Cruz-Garcia and Angelita[2] were originally from the Dominican Republic. ROA.11482–85. They met in the mid-1980s in Puerto Rico, where it was common for young Dominicans to emigrate in search of work. ROA.11484, 2529–33, 2534—50.

Carmelo Martinez Santana,[3] Angelita's cousin, went to Houston in the late 1980s and began selling drugs. ROA.11519. A few years later, he recruited Cruz-Garcia to work with him in the Houston drug trade. ROA.11520–21.

Diana Garcia and Arturo Rodriguez met Cruz-Garcia "through the drugs." ROA.11494. Arturo, Diana, Cruz-Garcia, and Angelita became friends. ROA.11534. Diana and Arturo sold drugs as part of Santana and Cruz-Garcia's operation. ROA.11062–63. They dealt from the one-

---

[1] Some documents in the record refer to Cruz-Garcia by the nickname "Chico."

[2] Because several people involved in this case have the same or similar last names, they are referred to by their first names to avoid confusion.

[3] In the record, Santana is variously referred to as "Santana," "Martinez," "Carmelo," and by his nickname "Rudy."

bedroom apartment where they lived with Angelo, Diana's six-year-old son. *Id.*

Bienviendo Melo also assisted with the drug operation. ROA.11327. Three brothers named Cesar Rios, Jose Valdez, and Hector Saavedra were among the group's friends. After Diana caught Arturo with another woman, she began having an affair with Jose. ROA.14579, 14588. Diana also had a sexual relationship with Cruz-Garcia. ROA.14574, 14579, 14588.

Santana became severely addicted to cocaine and began to spiral out of control. ROA.11523-24, 2553. In 1992, Santana was convicted of assaulting a 6-year-old girl. ROA.2493. According to police reports, Santana was on drugs at the time and started "hallucinating and became violent." ROA.2500, 2494. He "charged toward" the mother and her child, grabbed the child by her hair, and then threw her "to the concrete ground when her mother attempted to protect her." ROA.2500.

Melo's girlfriend, Linda Hernandez, was also fearful of Santana, saying "his eyes were always red," he looked like he was on drugs, and there was "just something about him." ROA.11348–49. Santana "would

always want to take [her] son to the store with him." *Id.* This bothered Linda and she would "never let him take him anywhere." ROA.11348.

## B.     In September 1992 Angelo was abducted and killed.

On the night of September 30, 1992, two masked men broke into Diana and Arturo's apartment. ROA.11083–99. One of the men restrained and beat Arturo. ROA.11086. The other man sexually assaulted Diana. ROA.11092. When the men left, they took Angelo with them. ROA.11097. In November 1992, Angelo's body was found on the banks of a bayou. ROA.11366-68.

Neither Diana nor Arturo could identify the assailants. ROA.11122, 11143. The police collected several items of evidence for forensic testing, including Diana's underwear and a vaginal swab. ROA.11023, 11221. The police also collected a cigar that had been left at the apartment, but later told Diana they did not believe it was connected to the offense. ROA.2444.

Santana and Angelita were interviewed and denied knowing anything. ROA.2452–55. Cruz-Garcia left Houston shortly after Angelo's abduction. Diana told the police that Cruz-Garcia "was already on the run for whatever reason." ROA.2451.

Investigators developed a variety of suspects, including a customer of Diana's who said "he would like to go back and rip her off one day" and a group that had recently committed "a dope rip off in the same area of town." ROA. 1797–99. Investigators eventually came to believe that Cruz-Garcia may have been "behind the kidnapping or knows the identities of the individuals who committed the kidnapping." ROA.1778.

**C.    The evidence was tested by the HPD Crime Lab and Genetic Design.**

The cigar, underwear, and vaginal swab were sent to the HPD Crime Lab. ROA.3794, 10797. The evidence was initially processed by analyst Deetrice Wallace. ROA.3794,10865. Analyst Baldev Sharma subsequently performed DNA extractions on the rape kit, including cutting a section of Diana's underwear. ROA.10853—54, 3794–97. The DNA extractions were then sent to Genetic Design, a California lab, as were DNA samples from several males, including Arturo and Melo. ROA.13736. None of the DNA samples, including Arturo's, matched the DNA from the underwear. ROA.13747. Melo and potentially Arturo, however, were identified as possible contributors to the DNA on the vaginal swab. ROA.13734, 13755–56. In January 1993, the HPD Crime

Lab informed investigators of these "two possible hits." ROA.1787; *see also* ROA.3795.

### D. The HPD Crime Lab was closed due to incompetence.

The case eventually went cold. Meanwhile, the HPD Crime Lab was rocked by scandal. A 2002 state audit found that the DNA section was "in shambles," ROA.12967–68, and the DNA section was closed in December 2002. *Id.* The City of Houston retained Michael Bromwich, a former inspector general of the United States Department of Justice, to investigate. Bromwich concluded that "the risk that casework performed by the Crime Lab, *particularly the DNA Section*, would lead to a miscarriage of justice was unacceptably high." ROA.13247 (emphasis added). Bromwich found that Sharma, who performed the DNA extractions in Cruz-Garcia's case, had "no experience in forensic science," and "weak[]" skills as a DNA analyst. ROA.12934–35. Sharma was eventually demoted after numerous complaints against him were sustained, including at least four instances of "incompetency," "misconduct," and "improper police procedure." ROA.13681—86. Wallace, who initially processed the forensic evidence, was subsequently

convicted of tampering with a government record in another case. ROA.13709—13.

### E. The DNA evidence was retested.

In 2007, HPD sent the cigar, the vaginal swab, and the cutting from the underwear to outside lab Orchid Cellmark, where they were tested by analyst Matt Quartaro. ROA.10818. Both the vaginal swab and the underwear contained sperm from at least two men. ROA.10822-23. Contrary to the earlier testing, Quartaro found that Arturo could not be excluded as a contributor to the sperm mixture from the underwear. ROA.10824. Also contrary to the earlier testing, Quartaro found that Melo could be excluded as a contributor to the vaginal swab. ROA.3706, 10824–25. Like the earlier testing, however, Quartaro found that Arturo could not be excluded as contributor to the sperm mixture from the vaginal swab. ROA.10821. Quartaro also tested the cigar. He found that whoever's DNA was on the cigar also could not be excluded as a contributor to the sperm mixtures on the underwear and the vaginal swab. ROA.10823.

An analyst at the newly reconstituted HPD Crime Lab, Courtney Head, obtained a DNA sample from Cruz-Garcia. ROA.11762. Using

Quartaro's DNA profiles from the cigar, underwear, and vaginal swabs, she determined that Cruz-Garcia was a match for each. ROA.11765–68. Based on this DNA analysis, Cruz-Gracia was indicted for capital murder. ROA.10806.

**F.    The State later admitted that its DNA analysis was seriously flawed**.

On November 3, 2015, the State issued a revised DNA report concluding that, contrary to the testimony it presented at Cruz-Garcia's trial, neither Cruz-Garcia nor Arturo should have been matched to the sperm mixture from the vaginal swab and Arturo should not have been matched to the sperm mixture from the underwear. ROA.14912–15. Thus, the result of the DNA analysis should have been that there was at least one unknown contributor to the sperm mixture on the underwear and the vaginal swab. This revised report thus answered the question the State would later ask at closing argument: "[I]f Obel Cruz-Garcia was not the one, . . . where is the DNA of the guy who raped Diana? Where is it? Why don't we have it?" ROA.11905.

|  | **1993 Genetic Design testing results[4]** | **2010 Orchid Cellmark testing results** | **2015 revised report** |
|---|---|---|---|
| **Underwear cutting** | Arturo is excluded | Arturo and Cruz-Garcia cannot be excluded | An unknown male and Cruz-Garcia cannot be excluded |
| **Vaginal swab** | Arturo and Melo cannot be excluded | Melo is excluded, Arturo and Cruz-Garcia cannot be excluded | No conclusion can be drawn |
| **Cigar** | Not tested | Cruz-Garcia cannot be excluded | Cruz-Garcia cannot be excluded |

## G. In Puerto Rico, Cruz-Garcia became a devout Christian after being incarcerated.

Cruz-Garcia was charged with capital murder in September 2008. At the time, Cruz-Garcia was serving a sixteen-year sentence in Puerto Rico. After returning to the Dominican Republic in 1992, he provided critical assistance to federal law enforcement agencies, helping them uncover criminal activity and bring offenders to justice. ROA.12014–18, ROA.2548, ROA.1968. The United States government frequently granted Cruz-Garcia public interest visas to enter the United States. ROA.2705. In October 2001, while Cruz-Garcia was in Puerto Rico on a public interest visa, he was arrested in connection with a kidnapping and

---

[4] None of the evidence was tested against Cruz-Garcia's DNA.

extortion scheme. ROA.2705, 12007-08. Cruz-Garcia pleaded guilty and was sentenced to sixteen years in prison. ROA.12008.

Cruz-Garcia initially had some difficulty adjusting to life in prison. About a year in, a cell search revealed a damaged window, a rope made of bedsheets, a map, and a cell phone, suggesting either Cruz-Garcia or his cell mate were contemplating an escape attempt. ROA.12068.

That incident from 2003, however, ended up being the only blemish on Cruz-Garcia's Puerto Rican prison record, which ran into 2010. ROA.14926–27. Cruz-Garcia subsequently "rediscovered his faith" and became a dedicated Christian. ROA.14563. He sought out counseling, ROA.14543, and expressed remorse for "having made bad decisions before he was incarcerated, when he did not have God in his life." ROA. 14563.

After Cruz-Garcia's conversion, he maintained an exemplary prison record. ROA.14926–27. He routinely impressed prison chaplains and others with his devotion to God. ROA.14543–44, 14561–64, 14570–71, 14533–35, 14551–52. Cruz-Garcia was given a significant role in the church services in the prison, taking part in music services, leading Bible study, *id.*, and delivering sermons to the inmates. ROA.14571, 14535,

14551, 14563. Through his good behavior, Cruz-Garcia earned the right to work in the "cooperation area," where inmates worked with power tools. ROA.14571, 14551, 14562. "He was kind to both inmates and guards" and earned their respect and trust. ROA.14570, 14534, 14552. "Even the prison's superintendent was fond of and sincerely trusted Obel." ROA.14534. He was not only permitted to move around the prison unsupervised, he was given keys to parts the prison. ROA.14570, 14551, 14562.

The filing of capital murder charges against Cruz-Garcia required that he be reclassified to maximum custody. ROA.14928. Irma Iglesias Cruz, a senior chaplain with over forty years of experience, became concerned about whether Cruz-Garcia "would find it very difficult to maintain his faith and conviction after he was moved into segregation." ROA.14535. As she later wrote, her concern was unfounded:

> To the contrary, even after Obel was transferred into a segregated cell, we could hear him, from our chapel, giving sermons to the other inmates in segregation. He took the initiative to lead services, His faith never failed him. We were all so proud of him. Everyone would listen to him. I knew his faith and beliefs were strong.

ROA.14535.

### H. As Santana's mental health worsened, he implicated Cruz-Garcia.

While Cruz-Garcia was incarcerated in Puerto Rico, Santana was in federal prison for federal drug trafficking offenses. The federal court ordered a competency evaluation before Santana was allowed to plead guilty. ROA.1774–76. He was ultimately sentenced to twelve-and-a-half years. ROA.2481.

In 2009, investigators interviewed Santana, who again denied having any knowledge of who abducted and murdered Angelo. ROA.2456–58. In 2011, Santana wrote a letter to the federal court explaining he was "planning to mount a collateral challenge based on [his] continued incompetence to accept a guilty plea, and to be sentenced" and had "a plethora of records" to show his "undeniable incompetence." ROA.1772.

One month later, the FBI interviewed Santana again. The investigators told Santana that Cruz-Garcia had already been charged and that DNA evidence linked him to the crime. ROA.2624. They also repeatedly assured him that "any cooperation he gave would be made known to the prosecutor and the presiding judge." ROA.2624–25, 2630.

Santana eventually told the investigators that he, Cruz-Garcia, and a third man, Rogelio Aviles, went to Diana and Arturo's house the night of Angelo's abduction. According to Santana, he waited in a car while Cruz-Garcia and Rogelio went into the apartment and returned with Angelo. ROA.2629. Then, the four drove to a bayou where Cruz-Garcia told Aviles, "you know what you have to do." ROA.2631. Aviles then stabbed Angelo, ROA.2632, and Aviles and Santana threw his body in the water. ROA.2634.

In a later interview, Santana implicated Cruz-Garcia in the murder of a man named Saul Flores. The prosecutor would later explain that the State decided to seek the death penalty against Cruz-Garcia based on his alleged participation in that murder. ROA.3773.

## I. Cruz-Garcia was appointed counsel who maintained an unmanageable workload.

In 2010, Cruz-Garcia was transferred from Puerto Rico to pretrial detention in Harris County. ROA.12245. Cruz-Garcia's family raised funds through their church in Puerto Rico to retain private counsel for Cruz-Garcia, ROA.2542, and eventually hired Steven Shellist and Christian Capitaine. ROA.14439–40.

Both attorneys immediately grasped the importance of the DNA evidence. *Id.*. They retained a DNA expert, Dr. Elizabeth Johnson, to assist the defense and obtained a continuance to give her time to review that evidence. ROA.14439–40, 7065. They pursued discovery concerning the DNA and prior testing by Genetic Design. ROA.6999–7003, 7121–21, 7787. They also uncovered the criminal and disciplinary histories of Wallace and Sharma. ROA.7060–71.

Before Dr. Johnson could assess the DNA evidence, however, the State gave notice of its intention to seek the death penalty against Cruz-Garcia. ROA.14439. Shellist and Capitaine did not believe they were "qualified to serve as counsel in death penalty cases" and withdrew. *Id.*.

The trial court appointed Skip Cornelius as first-chair and Mario Madrid as second-chair. ROA.6887–88. Shellist and Capitaine offered to consult with Cornelius about the case, but he declined. ROA.14440. Cornelius also refused to consult with Dr. Johnson or any other DNA expert.

The defense team also consisted of two investigators, J.J. Gradoni and Edna Velez. Counsel did not retain a mitigation specialist. Only Madrid and Velez spoke Spanish. After being appointed in August 2011,

the defense team did not visit Cruz-Garcia until May 2012. ROA.14607. Throughout the entire representation, Cornelius only met with Cruz-Garcia twice at the jail. ROA.15131.

Cornelius maintained a massive caseload. During the time he represented Cru-Garcia, he was appointed to over 400 felony cases and at least sixteen non-death capital murder cases, two of which he tried within a month of Cruz-Garcia's trial. ROA.3510–32; ROA.3833–5194, ROA.5621–94. On top of that Cornelius was appointed to five other death penalty cases. *Id.*

## II.   The Trial

### A.   Jury Selection (June 3 to June 17): Cornelius bills over 50 hours to other cases.

Because Cornelius charged a flat fee, he did not keep time records in Cruz-Garcia's case.[5] The effect of Cornelius's crushing caseload, however, are obvious from comparing billing invoices in his other cases to the events in Cruz-Garcia's trial.

When jury selection began on June 3, 2013, a significant amount of trial preparation remained to be done. This is made clear by the time

---

[5] Trial counsel's flat fee arrangement violated both the ABA and Texas Guidelines. ABA Guideline 9.1.B.1 ("Flat fees, caps on compensation and lump-sum contracts are improper in death penalty cases."); Texas Guidelines 8.1.B.1 (same).

entries of Cornelius's investigator's invoices. ROA.14647–50 (reflecting attempts to locate and identify witnesses throughout jury selection and into trial). Nevertheless, during the 11 days of jury selection, Cornelius claimed fees for nineteen court appearances and billed 50 hours in other cases. *See* ROA.3539–41. On the two weekends in that period, Cornelius also billed over 14 hours to other cases. *Id.*

**B.**   **Hearing on the Motion to Suppress DNA Evidence (June 19): Cornelius continues to bill extensively to other cases.**

With no forensic evidence tying Cruz-Garcia to the offense other than the DNA, the trial court heard a critical defense motion to suppress that evidence. ROA.7290–92. The motion was based principally on work performed by Cruz-Garcia's retained counsel before their withdrawal.

In just the two days immediately prior to the hearing, Cornelius billed 6 and 10 hours to other cases respectively. ROA.3541–42, ROA.3923, 3972, 3993, 4007, 4094, 4071. On the day of the hearing, which totaled 121 pages of transcript, Cornelius made three court appearances and billed 5.5 hours in other cases. ROA.3542, 3921, 3923, 3989, 4088, 4094, 4118.

**C. The court's ruling (July 3): Cornelius spends nearly all his time on other cases as the court precludes the defense from presenting any evidence of the HPD Crime Lab scandal or the prior testing.**

The court deferred ruling on the motion. In the intervening two weeks, Cornelius billed 76.05 hours to other cases. and made twenty court appearances in other cases. ROA.3542–45. Cornelius did not attend the hearing in which in the court announced its ruling. ROA.10902. Instead, he billed 7.75 hours to other cases. ROA.3545, 3883, 3926, 3937, 3959, 4094, 4114, 4161.

In a devastating blow to the defense, the trial court not only denied the Motion to Suppress, it also precluded the defense from offering any evidence concerning:

- the original DNA testing which identified Melo as a possible contributor on the underwear;

- that the DNA evidence had been handled and processed by Wallace (who was subsequently convicted on tampering with a government record) and Sharma (who was repeatedly cited for incompetence); or

- any of the findings of the Bromwich Report concerning the malfeasance, misconduct, or incompetence of the DNA section at the HPD Crime Lab.

ROA.10909, 10915–18, 10944.

Over the next three days, Cornelius billed 8, 8.75, and 8.5 hours to other cases. ROA.3545, 3841, 3893, 3926, 3937, 3959, 3889, 4007, 4118, 4128, 4148.

**D.    Guilt phase day 1 (July 8): Cornelius bills 4 hours to other cases as the State presents four witnesses.**

On the first day of trial, Cornelius billed 4 hours to other cases. ROA.3545, 3867, 3889, 4161.

The State's first two witnesses were police who initially responded to the crime scene. ROA.10981, 10997. The next witnesses were Diana and Arturo, who both described the attack on September 30, 1992. ROA.11083–99, ROA11141–51. At no point during Diana's direct or cross-examination was she asked whether she and Cruz-Garcia had a sexual relationship.

**E.    Guilt phase day 2 (July 9): Cornelius bills 5.5 hours to other cases as the State presents seven additional witnesses.**

The next day, Cornelius billed 5.5 hours to other cases and made two court appearances. ROA.3546, 3874, 3899, 4007, 4021, 4133.

In addition to wrapping up Arturo's testimony, the State called several more law enforcement witnesses. One of those was Officer U.P. Hernandez, ROA.11249, who during an interview of Diana explained that law enforcement knew the cigar had *not* been left by the assailants. ROA.2444. Cornelius did not cross-examine Hernandez about the cigar and the State's assertion that the cigar had been left by the assailants went completely unrebutted.

**F.    Guilt Phase day 3 (July 10): Cornelius bills 4 hours to other cases while waiving his cross-examination of Santana and admitting that he never reviewed the State's file.**

The following day, Cornelius billed 4 hours to other cases and made three court appearances in another case, ROA.3546, 3867, 3976, 3978, 3982 4021, 4133, while the State presented six witnesses, including Santana.

The State's first witness was Dr. Dwayne Wolf, a medical examiner. ROA.11407. He testified that he could conclude that Angelo was

murdered, ROA.11425, but he could not determine the cause of death. ROA.11421–22.

The State also called Angelita, who described coming to Houston from Puerto Rico, ROA.111486–87, and eventually becoming friends with Diana and Arturo. ROA.11493–94. She testified that when she went to sleep at round 9 p.m. on the night of September 30, 1992, Cruz-Garcia was in the apartment and that he was there when she woke up in the morning. ROA.11502–03. She recounted that after she told Cruz-Garcia about the Angelo's abduction, Cruz-Garcia decided to return to Puerto Rico and that the trip was unplanned. ROA.11500–01. About two months later, she went to Santo Domingo and asked Cruz-Garcia for a divorce. ROA.11506–07. Angelita claimed that she then asked Cruz-Garcia whether he had anything to do with Angelo's murder and Cruz-Garcia answered that he had killed him. ROA.11508.

On cross-examination, Angelita admitted that she had not said anything about Cruz-Garcia confessing to her when she was interviewed by defense investigators or when she was interviewed by investigators. 2008. ROA.11510–13. Three years after the trial, the State would assist Angelita with adjusting her immigration status. ROA.3714–15.

The next witness was Santana. He recited his account of Angelo's murder and abduction. ROA.11536–60. At the conclusion of Santana's direct examination, Cornelius announced that he would waive cross-examination because he was "just not ready to cross him today." ROA.11575, 11585–86.

The State proceeded to call FBI Agent William Ebersole, who interviewed Santana in May 2011. After the State completed its examination, Cornelius announced that he could also not cross Ebersole because he "got new information about all of this just now." ROA.11584. In fact, the "new information" was Santana's statement to the FBI, which was in the State's open file but that Cornelius had never reviewed. *Id.* This was made clear when Cornelius stated he wanted "to go on the record about something" and the following exchange occurred:

| MR. CORNELIUS: | Yeah. I want to make sure we understand each other. I don't have a responsibility to go through your file and figure out what's in your file. I don't have to do that. If I wasn't given this and you knew you were going to call the witness, then how do I know – |
|---|---|
| MS. TISE: | I have e-mail after e-mail to you, Skip, that I can print out saying: Please come by and see my file. It's opened to you. |

|  |  |
|---|---|
|  | In fact, when you stopped by my office last week with Lester Blizzard, I – |
| THE COURT: | I don't think we need to put this all on the record. |
| MR. CORNELIUS: | Well – |
| THE COURT: | If you want to argue, we'll go off the record. |
| MR. CORNELIUS: | I'm not going to try to figure out what's in your file. |
| MS. TISE: | I told you. I said – |
| MR. CORNELIUS: | I'm not going to go through 20 boxes of DNA records. |
| MS. TISE: | I told you, Skip, you need to come by and see my file. |
| THE COURT: | All right. Let's go off the record, Mary Ann. |

ROA. 11587–88. Cornelius later confirmed to post-conviction counsel that he had not taken advantage of the State's open file policy, stating "I don't play that game." ROA.14778.

### G. Guilt phase day 4 (July 11): Cornelius bills 4 hours to other cases while flubbing another opportunity to cross Santana and failing to challenge the DNA evidence.

The following day, Cornelius billed 4 hours to other cases. ROA.3546, 3974–75, 3977, 4021, 4024. The State recalled Santana,

thereby giving Cornelius another opportunity to cross-examine him. ROA.11609. Cornelius's lack of preparation became immediately apparent. Cornelius sought to impeach Santana but admitted he was not sure which prior convictions he could introduce because he had "some conflicting information from my own investigators and so, I'm going to accept pretty much whatever the State tells me or what he [Santana] tells me." ROA.11623–24.

For example, Cornelius did not know the gender of the victim of Santana's 1992 child assault conviction. ROA.11626–27. That fact was crucial because it was a crime of moral turpitude only if the victim was a girl. ROA.11628, 11633–34; *see Hardeman v. State*, 868 S.W.2d 404, 407 (Tex. App.—Austin 1993, pet. dism'd). Cornelius simply asked Santana on *voir dire* about the victim's gender and Santana lied that it was a boy. ROA.11626–27. Hence the court refused to allow Cornelius to question Santana about assaulting a child just months before Angelo's murder. ROA.11630–31.

Cornelius also never asked Santana, and the jury never learned, about Santana's history of mental illness, his letter to the federal court

in April 2011 about his continued incompetence, or his psychiatric examination in 1998.

The State's final two witnesses were Quartaro from Orchid and Head from the HPD Crime Lab. Both testified to results of their testing and analysis of the DNA evidence. Over Cornelius's objection, the court again ruled that the witnesses could not be questioned concerning the HPD Crime Lab's prior involvement and the prior results. ROA.11727–33.

Having failed to consult with a DNA expert, Cornelius could not cross-examine either Quartaro or Head concerning the numerous errors in the DNA analysis. The jury therefore never learned that—as the State conceded after trial—neither Cruz-Garcia nor Arturo should have been identified as contributors to the sperm mixture on the vaginal swab, nor that Arturo should not have been identified as a contributor to the underwear.

Cornelius announced the defense would rest without calling any witnesses. ROA.11781. The jury therefore never heard from Cesar, who was identified as a known associate of Cruz-Garcia's in police reports and would have testified that Diana and Cruz-Garcia maintained a

consensual sexual relationship. ROA.14574. Nor did the jury hear from Rio's brother Jose, who was also having an affair with Diana and knew of her relationship with Cruz-Garcia. ROA.14588.

**H.    Guilt phase day 5 (July 12): Cornelius again bills 4 hours to other cases despite an all-day charge conference.**

On the day of the jury charge conference, which lasted an entire day, Cornelius billed 4 hours to other cases. ROA.3546, 3974–77, 4021, 4024. The following day, a Saturday, Cornelius billed 6.5 hours to other cases. ROA.3546, 3988, 4007, 4114.

**I.    Guilt phase day 6 (July 15): Cornelius bills 2.25 hours to other cases as the State emphasizes the DNA evidence.**

On the day of closing arguments, Cornelius billed 2.25 hours to other cases. ROA.3546, 4007, 4114. In its closing, the State relied heavily on its flawed DNA analysis, telling the jury that it was "the most damming" evidence against Cruz-Garcia. ROA.11858. The State emphasized that all the of the DNA from the sperm mixture had been accounted for, meaning that Diana's assailant could not have been anyone except Cruz-Garcia:

> Ladies and Gentlemen, if Obel Cruz-Garcia was not the one, if his DNA was there from some consensual sexual encounter that they made up out of whole cloth—and there is no

evidence of that—where is the DNA of the guy who raped Diana? Where is it? Why don't we have it? If at some unknown time Obel Cruz-Garcia had a consensual relationship with Diana, again, that there is no evidence of, where is the DNA of the guy who raped her?

ROA.11904. The jury returned its guilty verdict that day. ROA.11924.

> **J.** **Punishment phase day 1 (July 16): Cornelius bills over 6 hours to other cases and appears in court in another case as a State witness reveals Cruz-Garcia was a confidential informant.**

On the first day of punishment, Cornelius made a court appearance and billed 6.25 hours to other cases. ROA.3547, ROA.3876–79, 4133, 4161.

The State focused on a kidnapping in Puerto Rico for which Cruz-Garcia had pleaded guilty. A Puerto Rican law enforcement agent revealed on *voir dire* that "someone from the United States government" had confirmed to him that Cruz-Garcia had provided assistance to federal law enforcement. ROA.12014–15. The trial court acknowledged the mitigating value of that testimony but excluded it on hearsay grounds. ROA.12017.

The State's final witness of the day was a Puerto Rican correctional officer who testified that in October 2003, he found a rope made of bed sheets and a map in the cell Cruz-Garcia shared. ROA.12063. He also

found a cell phone on Cruz-Garcia and the window appeared to have been tampered with. 12067–71.

Because trial counsel decided to concede the future dangerousness special issue and did not investigate Cruz-Garcia's Puerto Rican prison record, that testimony was the only account the jury heard about Cruz-Garcia's prior incarceration. The jury never learned that this was the only incident on Cruz-Garcia's Puerto Rican prison record, nor that Cruz-Garcia underwent a religious transformation and dedicated himself to God. ROA.14543-44, 14561-64, 14570-71, 14533-35, 14551-52. The jury also never learned that, far from being a flight-risk or threat, Cruz-Garcia became one of the most trusted inmates and was even given keys to parts of the facility. *Id.* Nor did the jury learn that Cruz-Garcia proselytized to his fellow inmates, counseled them, and was widely seen as *positive* influence in the prison. *Id.*

## K. Punishment phase day 2 (July 17): Cornelius bills over 3 hours to other cases as Santana implicates Cruz-Garcia in the murder of Saul Flores.

As the State continued its future dangerousness case, Cornelius billed 3.25 hours and appeared in court for two cases. ROA.3547, 3840, 3882–83, 4007, 4038.

The State's evidence focused on the murder of Saul Flores and Cruz-Garcia's supposed involvement. In addition to testimony by an HPD officer and an associate of Cruz-Garcia, the State called Johnny Lopez, a friend of Flores's. ROA.12145–46. Johnny had been interviewed during the original 1989 investigation and told the police that Flores was on the run from someone named Shorty. ROA.1830–32. In his 1989 statement, Johnny never mentioned Cruz-Garcia. At Cruz-Garcia's trial, however, Lopez testified that Flores was on the run from Cruz-Garcia. ROA.12151.

On cross-examination, Lopez denied that he had ever told the police that Flores was running from Shorty or that he had never mentioned Cruz-Garcia to the police. ROA.12152–55. Cornelius, however, inexplicably failed to introduce any evidence of Lopez's 1989 statement, despite its admissibility as a prior inconsistent statement. *See* TEX. R. EVID. 613.

The State then called Santana, again. Santana described a number of other purported bad acts by Cruz-Garcia, none of which the State attempted to corroborate. ROA.12162–71. With respect to Flores's murder, Santana claimed that a woman named Elizabeth Ramos, who was Cruz-Garcia's mistress, had called Cruz-Garcia to tell him that

Flores was at her apartment "courting her." ROA.12174–75. According to Santana, this so enraged Cruz-Garcia, he went to Elizabeth's apartment with Santana and two other men. ROA.12175–76. They then took Flores to Shorty's apartment where Cruz-Garcia tied up Flores, beat his hands until they were "completely destroyed," injected him with drugs, burned him with cigarettes, and then broke his neck. ROA.12180–82, ROA.12193–94.

The defense did not investigate the Flores murder. An investigation would have revealed that Elizabeth, the source of the supposed conflict between Flores and Cruz-Garcia, had no recollection of a "Saul Flores," was certain no one by that name ever "courted" her, and was sure that she never called Cruz-Garcia to report as much or that Cruz-Garcia ever picked up anyone from her apartment, notably because she had been living with her mother at that time. ROA.1834.

The State's final witness concerning the Flores murder was Dr. Wolf, who testified that it appeared that Flores had died from being strangled with a rope or cord of some kind. ROA.12204. He also testified that Flores had an abrasion on his right thumb and on the knuckle of his left pinkie, but that his hands were otherwise intact—not "completely

destroyed" as Santana testified. ROA.12212–14. There was nothing on Flores's body that looked like cigarette burns. ROA.12214. There were also no fresh needle marks, indicating he had not been "shot up with drugs" before he died. ROA.12215.

The State then had two witnesses, guard Darryl Novak and Sergeant David Davis, testify regarding "a few minor violations" Cruz-Garcia committed while in pretrial detention, including failing to turn in a shaving razor. ROA. 12231–46

The State then called a prison classifications expert named Bonnie Fiveash. She testified generally to the privileges available to a non-death sentenced inmate, ROA.12259–62, which the prosecutor suggested would provide many opportunities for violence. ROA.12265–76. Because trial counsel did not investigate Cruz-Garcia's incarceration in Puerto Rico, the jury never learned that Cruz-Garcia had been granted even greater privileges without incident. The final punishment phase witness for the State was Diana Garcia, who described Angelo and the impact of his murder on her and her family. ROA.12291–12301.

**L.    Punishment phase day 3 (July 18): Cornelius bills 5.5 hours to other cases while presenting essentially no case in mitigation.**

On the following day, the defense called its only witnesses, the jury was charged, and both sides delivered closing arguments. Cornelius also billed 5.5 hours to other cases. ROA.3547, 3841, 3867, 3921–23, 3950, 4007.

The defense called just four witnesses, only two of whom testified live, and its punishment case totaled just 75 pages. The defense had not retained a mitigation specialist, ROA.15119, spent just 3 days in the Domincan Republic, and never traveled to Puerto Rico. ROA.14627. Two of the witnesses were Cruz-Garcia's wife, Mireya Perez, who testified via shoddy video link from the Dominican Republic, and son Abel,. ROA.12331–55, 12390–403. Cruz-Garcia's brother, Joel, had to pay his own way from Puerto Rico to Houston. ROA.2543. Over just 12 pages, including lengthy objections from the State, Joel provided only the briefest chronology of Cruz-Garcia's childhood and inadvertently made it appear that he had experiences a positive childhood in the Dominican Republic. ROA.12355–66.

The defense's final witness was Angel Meza, a teenager who had met Cruz-Garcia while in pre-trial detention. ROA.12403–09. Just as he had in Puerto Rican prison, Cruz-Garcia had positively influenced Meza, inspiring him to turn his life around. *Id.* Meza was never identified or contacted by trial counsel. Rather, he came to the courtroom after hearing about the trial, approached defense counsel, and asked to testify. ROA.12404. The jury foreman later described Meza as the most persuasive defense witness, stating "if it hadn't been for that kid, it would have been a much easier decision for me." ROA.7461.

Ultimately, from jury selection through sentencing, Cornelius billed $33,430.75 to other cases during Cruz-Garcia's trial. ROA.3539. For context, $35,000 was Harris County's presumptive flat fee for a first-chair attorney to litigate an entire death penalty case from start to finish. ROA.14602. Cornelius performed an equivalent amount of work on other cases over just the six weeks of Cruz-Garcia's trial.

## M. Punishment phase day 4 (July 19): The jury breaks a deadlock after the foreman reads Bible passages concerning the death penalty to the jury.

The jury retired to deliberate on Thursday afternoon and continued to deliberate until the end of the day on Friday, when it reached its

verdict. ROA.12531. On the evening after the verdict, juror Angela Bowman contacted trial counsel to inform him that the jury foreman, Matthew Clinger, read passages from the Bible to the other jurors during deliberations. ROA.7442-43, 7446-47. Bowman reported that juror Casey Guillotte, changed her vote after the Bible reading. *Id.*

In a recorded interview with Gradoni, Clinger confirmed that he had read from the Bible to the jury and that it had made a difference to at least one juror. He said that on Friday morning, "about a third of the jury"—including himself—were undecided and the rest of the jury was split between a life sentence and the death penalty. ROA.7459–60. At that point, Guillotte "broke down[.]" ROA.7469. Clinger stated that he knew Guillotte's "background," including "where she goes to church" and that "scripture is important to her." ROA.7470. Clinger then read from the Bible to the jury:

> Romans 13 is the passage I spoke about Friday morning. That Friday morning.
>
> You know, Paul's writing and saying that, uh, you know, the Lord has given the sword and, uh, the sword's really, it's not used for a slap on the hand. You know, I, that was, that was kind of the key passages I used. You know, Genesis 9 and a lot of places in Deuteronomy. So, you know. I just spoke knowing her, kind of, background and where she stood.

*Id.* Clinger confirmed that he read aloud directly from the Bible:

[Gradoni]: So did you read from the Bible or quote it from memory?

[Clinger]: No, I read.

[Gradoni]: Read it from the Bible.

[Clinger]: Yeah.

ROA.7471.

The passages Clinger read related directly to imposition of the death penalty. Genesis 9 commands the death penalty for murder:

> I will demand an accounting for the life of another human being. Whoever sheds human blood, by humans shall their blood be shed; for in the image of God has God made mankind.

*Genesis* 9:5–6 (New International Version). The Book of Deuteronomy likewise calls for the death penalty for numerous transgressions, including adultery. *See Deuteronomy* 22:22–24.[6] During closing arguments, the State emphasized Cruz-Garcia's adultery. ROA.12493–94.

After Juror Clinger read from the Bible, the jury was able to reach a unanimous decision on the future dangerousness special issue:

---

[6] *See also Deuteronomy* 13:5 (for inciting rebellion against the Lord); 17:12 (for refusing to obey the decision of a judge or priest); 18:20 (for false prophecy); 19:16–19 (for perjury); 21:18–21 (for disobedience to one's parents).

> Uh, after I read that she [Guillotte] was able to move, that
> was, we were finishing up talking about the first question and
> she was able to move on from the first question.

ROA.7471; *see also* ROA.7472 ("It made a difference with [Guillotte].").

Clinger also said that what he "researched" in the Bible "made a lot of difference to me, kind of earlier in the process." ROA.7470, 7472–73.

Bowman similarly recalled that after Clinger read from the Bible, Guillotte "changed her mind to vote for the death penalty." ROA.7413. Bowman also recalled that "other jurors changed their position from life to death after [Clinger] read scriptures from the Bible." *Id.*

## III. Motion for a New Trial.

Cruz-Garcia filed a Motion for New Trial alleging a violation of the Sixth Amendment based on the jury's reliance on the Bible, supported by a recording and transcription of Clinger's interview, as well as affidavits from Bowman, Gradoni, and Madrid. ROA.7384–867438–85,. Clinger refused to sign an affidavit when approached by the defense. ROA.12555.

After being contacted by the State, however, Clinger changed his mind and signed an affidavit that the State submitted in its response. ROA.7435. The affidavit contradicted Clinger's recorded statements. He claimed that he never read from the Bible at all, but only opened it to a chapter from Romans and placed it on the jury table. ROA.7436. Guillotte

also signed an affidavit, in which she claimed that Clinger did read the Bible but only to himself. ROA.7433. Clinger and Guillotte both claimed in their affidavits that the jury had already reached a decision (but had not signed the verdict form) when the Bible appeared. ROA.7433, 7436.

Cruz-Garcia requested an evidentiary hearing to permit live testimony from the jurors on this issue. ROA.7416—18. The trial court refused to hear live testimony, admitted the affidavits (but not the recording or transcription) into evidence, and then denied the motion. ROA.12575.

## IV.    Post-trial proceedings

### A.    Direct appeal.

The Texas Court of Criminal Appeals ("CCA") affirmed Cruz-Garcia's conviction and sentence on October 28, 2015. ROA.1386–1443. The United States Supreme Court denied his petition for writ of certiorari on April 4, 2016. *Cruz-Garcia v. Texas*, 578 U.S. 908 (2016).

### B.    State Habeas Proceedings

#### 1.    The State partially recanted its DNA analysis.

Cruz-Garcia filed his initial state habeas application on August, 28, 2015. ROA.14171–14362. After the State issued its amended DNA report

on November 3, 2015, *see infra*, Facts II.F, Cruz-Garcia filed a successive petition. ROA.14934–62.

## 2. After losing her reelection bid, the trial judge compressed the state habeas process.

The trial court judge, Renee Magee, ran for reelection during the pendency of Cruz-Garcia's state habeas application in her court. On her campaign website, Judge Magee prominently featured a Houston Chronicle article about Cruz-Garcia's trial. ROA.2019–21.

On November 8, 2016, Judge Magee lost her bid for reelection. ROA.15283–84. Cornelius filed his affidavit on November 28, stating that he wished for Judge Magee specifically to adjudicate his representation before she left the bench. ROA.15114–20. Madrid and Gradoni also filed affidavits. ROA.15125–15128, 15131–15133. The following day, November 29, the State moved for an order directing the parties to submit proposed Findings of Fact and Conclusions of Law ("FFCL") by December 22. ROA.15136–37. The court granted the motion the next day. ROA.15138.

Cruz-Garcia filed several motions seeking fact development and, in the alternative, asked for a later deadline as his counsel were conducting a week-long evidentiary hearing in December. *See* ROA.15141–47,

15588–97, 15186–96, 15197–208. On December 29, Judge Magee signed the State's proposed FFCL *verbatim*— two days before her tenure terminated. ROA.15209–59.

The CCA thereafter denied relief that Cruz-Garcia. ROA.15603–08.

## C. Federal District Court and Subsequent State Court Proceedings.

Cruz-Garcia filed his initial federal petition on October 31, 2018, ROA.53, and an amended petition on July 1, 2019. ROA.999. On January 29, 2001, the district court stayed the federal proceedings under *Rhines v. Weber*, 544 U.S. 269 (2005) so that Cruz-Garcia could fully exhaust his federal claims. ROA.3375–86. Cruz-Garcia filed a subsequent state habeas application on April 9, 2021, ROA.15682–84, which the CCA denied on October 6, 2021. ROA.15691–16079. Cruz-Garcia filed a Second Amended Petition on May 4, 2022. ROA.3423. On July 12, 2022, he filed motions for discovery and an evidentiary hearing. ROA.6096–102, 6103–132. On January 11, 2023, the district court denied the motions without prejudice, finding that it needed to resolve procedural issues before turning to fact development. ROA.6477, 6479. On September 25, 2023, the district court denied the petition. ROA.6482–6607. It did not revisit the discovery motion, but instead simply noted

40

that it had already been denied. ROA.6482. On October 23, 2023, Cruz-Garcia filed a motion to alter or amend judgment, ROA.6609–29, which the district court denied on March 12, 2024. ROA.6660.

## ARGUMENT

I.   **This Court should grant COA on the external influence claim.**

A.   **Cruz-Garcia alleged a substantial claim.**

Cruz-Garcia's right to a fair trial, impartial jury, and due process of law were violated when the jury foreman read Bible passages aloud to other jurors that influenced the verdict. *See* Facts III. Under clearly established Supreme Court precedent, "a jury's verdict must be based upon the evidence developed at the trial," and that protection "goes to the fundamental integrity of all that is embraced in the constitutional concept of a trial by jury." *Turner v. Louisiana*, 379 U.S. 466, 472 (1965) (internal quotations omitted); *see Parker v. Gladden*, 385 U.S. 363, 365 (1966); *Remmer v. United States*, 347 U.S. 227, 229 (1954); *Mattox v. United States*, 146 U.S. 140, 149 (1892).

In *Oliver v. Quarterman*, this Circuit held that "the Supreme Court has clearly established a constitutional rule forbidding a jury from being exposed to external influence" and that the Bible is such an external

influence. 541 F.3d 329, 336, 339 (5th Cir. 2008). Where an external influence upon the jury is credibly alleged, a court must hold a hearing to elucidate those allegations. *Remmer*, 347 U.S. at 230.

Clinger admitted in his recorded statement that he read aloud Bible passages during deliberations. ROA.7471, 7472. Bowman also stated that "[Clinger] read scripture from the Bible." ROA.7413. The relevant Bible passages related directly to the imposition of the death penalty. *See* Facts I.M. Clinger and Guillotte's affidavits differ in many facts from Clinger's recorded statement, *see* Facts I.M, but conceded that he at the very least put his Bible on the jury table during deliberations and opened it to a particular chapter. ROA.7436, 7433.

The external influence had a substantial and injurious effect on the verdict. Clinger stated that the Bible reading "made a difference" with Guillotte, who was struggling with the first question but was able to answer it after Clinger read from the Bible. ROA.7472. It also influenced Clinger's own decision. ROA.7473. Bowman also recalled Guillotte and other jurors changing their minds and voting for the death penalty after Clinger read from the Bible. ROA.7412–13.

While the state court record establishes a credible claim that an external influence impacted the jury, it is contradictory on some points. For that reason, an evidentiary hearing is appropriate to resolve Cruz-Garcia's claim—something which he has requested and been denied in the trial court, the CCA, and the district court. ROA.12550–01, 6812–14, 6096–102. The necessity for an evidentiary hearing notwithstanding, Cruz-Garcia has alleged a substantial Sixth Amendment claim.

### B. Cruz-Garcia raised a Sixth Amendment claim on direct appeal and in state habeas.

Following the denial of his motion for new trial, Cruz-Garcia raised an external influence claim on direct appeal.[7] ROA.6814–15. The CCA held that the Bible does not constitute an external influence: "This Court has never determined whether reference to the Bible during jury deliberations is an outside influence. Today we hold that it is not." ROA.7582. It then held that because the Bible was not an external influence, the juror affidavits were inadmissible under Texas Rule of Evidence 606(b) and the trial court erred by admitting them. ROA.7584.

---

[7] The district court stated that "Cruz-Garcia did not directly rely on any federal constitutional provision in his appellate briefing," ROA.6514 n.12, but that is clearly incorrect. Cruz-Garcia specifically invoked the Sixth Amendment, this Court's decision in *Oliver*, and key Supreme Court cases concerning outside influences. ROA.6814–15.

Cruz-Garcia also raised his external influence claim in state habeas. ROA.14322-30. The convicting court concluded that the claim need not be considered because it was rejected on direct appeal. ROA.15253. It also cited the direct appeal opinion to deny the claim in the alternative. *Id*. The CCA rejected the claim as procedurally barred because it had been raised and rejected on direct appeal. ROA.15605.

## C. Reasonable jurists could debate the district court's denial of this claim.

Cruz-Garcia argued two procedural pathways to merits review by the federal district court. First, he argued that § 2254(d) did not apply because the state court had not adjudicated the federal constitutional claim on the merits and the district court could therefore review the claim *de novo*. ROA.3476–78. Second, in the alternative, Cruz-Garcia argued that he could meet the relitigation bar under § 2254(d)(1) because the CCA's adjudication that the Bible was not an external influence as a matter of Sixth Amendment law, ROA.7582, "was contrary to, or involved an unreasonable application of, clearly established Federal law," namely *Turner*, *Remmer*, and *Parker*. ROA.3478–79.

The district court held that although the CCA adjudicated Cruz-Garcia's external-influence "primarily" as a matter of state law by relying

on Texas Rule of Evidence 606(b), it nonetheless adjudicated Cruz-Garcia's federal claim on the merits. ROA.6517, 6515 n.13. The district court also held that the CCA's adjudication was not an unreasonable application of clearly established federal law under § 2254(d)(1). ROA.6521. Reasonable jurists could debate both conclusions.

### 1. Reasonable jurists could debate the district court's determination that the CCA adjudicated Cruz-Garcia's claim on the merits.

There is a rebuttable presumption that a federal constitutional claim presented to a state court is adjudicated on the merits. *Harrington v. Richter*, 562 U.S. 86, 99–100 (2011). In *Johnson v. Williams*, 568 U.S. 289, 301–02 (2013), the Supreme Court held that a petitioner may rebut the presumption by showing that the federal claim was adjudicated under a less protective state-law standard. Here, the CCA held that the Bible is not an external influence under Texas Rule of Evidence 606(b). ROA.7584. That state-law standard is less protective than the federal constitutional standard, under which the Bible can be an external influence. *Oliver*, 541 F.3d at 339. Reasonable jurists could therefore

debate the district court's conclusion that the CCA adjudicated the external-influence claim on the merits.[8] *Johnson*, 568 U.S. at 301–302.

## 2. Reasonable jurists could debate the district court's application of § 2254(d)(1).

To the extent Cruz-Garcia's external-influence claim was adjudicated on the merits, the question for the district court was whether the CCA unreasonably applied clearly established federal law when it held that the Bible was not an external influence. For instance, in *Salazar*, the petitioner alleged that a juror shared his understanding of when the petitioner would be eligible for parole with other members of the jury. 419 F.3d at 389–90, 393. The state habeas court held that the juror testimony was inadmissible under Texas Rule 606(b). *Id.* at 398. On federal habeas review, this Court treated the question presented as whether, under clearly established federal law, the petitioner's

---

[8] This Court in *Salazar v. Dretke*, 419 F.3d 384, 397–98 (5th Cir. 2005) concluded that the state court "effectively adjudicated [the petitioner's] federal claim on the merits when it concluded that the State's invocation of Tex. R. Evid. 606(d) left [him] with no admissible evidence[.]" *Salazar*, however, was decided before *Johnson*. In *Allen v. Vannoy*, 659 F. App'x 792, 800–801 (5th Cir. 2016) this Court also assumed without explicitly deciding that § 2254(d) deference applied to a state court's decision to exclude juror affidavits alleging an external influence based on Louisiana Rule of Evidence 606(b). Because that decision was unpublished, however, it is not binding on this Court.

allegations concerned an external influence. *Id.* at 399–405. Concluding it did not, this Court denied relief. *Id.* at 405.

Similarly, in *Allen*, the petitioner alleged that a juror discussed the case with Sheriff's deputies who were potential prosecution witnesses and then shared those discussions with the jury. 659 F. App'x at 799. The state court excluded the petitioner's evidence under Louisiana Rule 606(b). *Id.* at 800. This Court granted a COA because "[r]easonable jurists could debate whether the state court unreasonably applied Supreme Court precedent when it held that [the juror's] statements do not involve external influences." *Id.* at 801.

Here, reasonable jurists could debate the district court's application of clearly established federal law concerning external influences. The district court cited *Pena-Rodriguez v. Colorado*, 580 U.S. 206, 225 (2017) for the proposition that "[t]he Supreme Court has specifically found an external influence only when a juror had relied on 'racial stereotypes or animus to convict a criminal defendant . . .'" ROA.6518–19. But the Supreme Court did not find that the jurors' racial animus and stereotyping was an external influence in *Pena-Rodriguez*. Had the Court done so, it would not have had to find a constitutional exception to the

non-impeachment rule, which is what it ultimately held. *Pena-Rodriguez*, 580 U.S. at 225.

Moreover, the Supreme Court *has* found external influences in several other cases, including *Parker*, *Turner*, *Remmer*, and *Mattox*, which this Court has identified as the clearly established law concerning external influences. *Oliver*, 541 F.3d at 334–36; *Salazar*, 419 F.3d at 400, 403.

The district court did acknowledge this Court's decision in *Oliver*, but purported to distinguish it on its facts. ROA.6519. Reasonable jurists could debate those distinctions for several reasons. First, the CCA decided as a matter of law that the Bible does not constitute an external influence. ROA.7582. That holding is contrary to *Oliver*'s holding that clearly established federal law says it can be. Second, the district court read *Oliver* as requiring that the Bible passages exactly mirror the facts of the case. ROA.6519 n.15. While *Oliver* noted that some of the passages at issue tracked the facts of that case, the Court did not suggest that its decision turned on that observation. 541 F.3d at 339. Rather, after an exhaustive review of the case law, this Court concluded that "[m]ost circuits have rules that when a Bible enters a jury room, the jury has

been exposed to an external influence," and specifically disapproved the one case reaching a different result. *Id.* at 336–39. Moreover, the Bible passages Clinger identified relate specifically to instances where the death penalty should be imposed, including murder and adultery. *See* Fact II.M.

Finally, the district court distinguished *Oliver* because the state habeas court found that the Bible was read only "after the jury had reached a unanimous decision." ROA.6519. As discussed below, for numerous reasons there was no state court factfinding regarding what actually occurred in the jury room that required deference. Moreover, the district court's factual distinction was not squarely supported by the trial court's own findings. ROA.15243 (crediting affidavit that incident occurred "during Friday deliberations").

Reasonable jurists could debate the district court's adjudication of § 2254(d). This Court should therefore grant COA on Cruz-Garcia's external influence claim.

### 3. The district court incorrectly deferred to state court fact finding.

The district court also held that § 2254(d)(1) was not met because "the facts, as determined by the state courts, do not violate the Supreme

Court's rule" against external influences and it owed deference to those facts. ROA.6521. It cited to statements made by the CCA on direct appeal and some findings of fact by the trial court in state habeas. ROA.6520. The district court's deference to these statements and findings is, however, debatable for several reasons.

First, where a court is confronted with credible allegations that an external influence was brought to bear on the jury's deliberations, a trial court must afford the defendant an opportunity to test the impact of that influence on the jury. *Remmer*, 347 U.S. at 230; *see also Barnes v. Joyner*, 751 F.3d 229, 242 (4th Cir. 2014) (clearly established federal law that due process requires a *Remmer* hearing); *Souffer v. Trammell*, 738 F.3d 1205, 1214 (10th Cir. 2013) (same). In the trial court and in the CCA, Cruz-Garcia emphasized that due process required a live hearing, which the trial court denied. ROA.12550–01, 6812–14. Because any factfinding by the state court failed to adhere to constitutionally required procedures, the federal district court was not bound by them under AEDPA. *Panetti v. Quarterman*, 551 U.S. 930, 953–54 (2007); *see also Mask v. McGinnis*, 233 F.3d 132, 140 & n. 5 (2d Cir. 2000) (no deference owed to state court

factual discussion when state court applied incorrect constitutional standard); *McGregor v. Gisbson*, 248 F.3d 946, 952 (10th Cir. 2001).

Second, because the CCA held on direct appeal that the juror affidavits were inadmissible, any purported factfinding concerning what occurred in the jury room is directly inconsistent with the CCA's appellate opinion prohibiting such factual inquiry. While the district court relied on *Murphy v. Davis*, 901 F.3d 578, 595 (5th Cir. 2018), for the proposition that the findings survived, ROA.6520, the opposite is true because they plainly inconsistent with the CCA's decision that the juror affidavits were inadmissible. They are also inconsistent with the CCA's procedural default in state habeas of the claim. The CCA's procedural default in state habeas further reinforced that prior ruling by indicating that the CCA did not revisit its appellate opinion that any factual inquiry was strictly prohibited.[9] Accordingly, deference is also not owed to the

---

[9] Moreover, to require a state court to expressly state it is *not* adopting certain findings of fact *in addition* to its clear indication to that effect by procedurally defaulting a claim runs counter to the Supreme Court's concern that federal habeas procedure not impose additional burdens on state courts. *Coleman v. Thompson*, 501 U.S. 722, 739 (1991) ("[W]e have no power to tell state courts how they must write their opinions."); *Johnson*, 568 U.S. at 300 ("[F]ederal courts have no authority to impose mandatory opinion-writing standards on state courts[.]").

trial court's fact-finding. *See Williams v. Quarterman*, 551 F.3d 352, 358 (5th Cir. 2008).

Third, to the extent any findings of fact do survive and are relevant to assessing whether the CCA's direct appeal adjudication meets §2254(d)(1), the district court erred by deferring only to some—but not all—facts found by the trial court. For example, the district court urged deference to the trial court's crediting of Juror Guillotte's affidavit that the Bible was read from only after deliberations ended. ROA.6520 (citing ROA.15243 ¶ 144).[10] But the district court failed to urge the same deference to the trial court's very next finding, crediting Juror Clinger's affidavit that the incident occurred "during the Friday deliberations". ROA.15243 ¶ 145. Additionally, the district court urged deference to the CCA's statement on direct appeal that the Bible "did not directly relate to a fact at issue before the jury[.]" ROA.6520 (quoting ROA.7583). To the extent this statement constitutes a finding of fact, no deference is owed because it was based on an unconstitutional standard, *see supra*, and is

---

[10] Paragraph 144 of the findings contains an obvious misstatement. The paragraph says that according to Guillotte's affidavit the Bible reading occurred after the verdict form was signed. ROA.15243. But Guillotte's affidavit is clear that Clinger brought out his Bible before he signed the verdict form. ROA.7433.

unsupported by the record. At a minimum, Juror Clinger's affidavit referenced Romans, which does include discussions of capital punishment. *See, e.g.*, Romans 13, 6:23.

Fourth, the district court injected findings of fact made in state habeas into its assessment of whether the CCA's adjudication of the claim on direct appeal met § 2254(d)(1). That is, it evaluated the direct appeal opinion based on facts found after, and in violation of, the CCA's appellate ruling. Section 2254(d), however, requires that the state court adjudication be evaluated based on the facts as they existed at the time of that adjudication. *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011) (§2254(d) "requires an examination of the state-court decision at the time it was made."); *Lucio v. Lumpkin*, 987 F.3d 451, 471–72 (5th Cir. 2021) (en banc). The district court's injection of later-in-time facts is particularly problematic here because it injected facts that directly contradict the CCA's summation of facts on direct appeal. *Compare* ROA. 7582. (CCA on direct appeal, "The other affidavits received by the trial court are ambiguous as to when her question was posed.") *with*, ROA.6520 (district court urging deference to the trial court's finding that the Bible reading occurred only after deliberations had ended).

### D. This claim should be remanded for an evidentiary hearing.

Ultimately this Court reviews the denial of an evidentiary hearing for abuse of discretion, *Halprin v. Davis*, 911 F.3d 247, 255 (5th Cir. 2018), but at this stage Cruz-Garcia need only show reasonable debatability of his claim to proceed on appeal. Based on the contradictions in the state court record and the state courts' refusal to permit fact-development with respect to these allegations, Cruz-Garcia requested a hearing in federal district court. ROA.6096–102. The district court initially denied the motion without prejudice, ROA.6477, and noted the previous denial without further discussion when it dismissed his petition. ROA.6482. This claim should be remanded for an evidentiary hearing for several reasons.

First, under Supreme Court precedent, where a trial court is confronted with allegations that an external influence was brought to bear upon the jury's deliberations, a court "should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate." *Remmer*, 347 U.S. at 230; *see also Barnes*, 751 F.3d at 242 (Supreme Court has "clearly established . . . a defendant's entitlement to

an evidentiary hearing, when the defendant presents a credible allegation" of an external influence); *Souffer*, 738 F.3d at 1214. Second, despite conflicting information, the state court did not permit resolution of critical questions of fact at an evidentiary hearing that presented a credible claim of an outside influence. Finally, Cruz-Garcia asked twice for a live hearing on this issue in state court. ROA.12550–01, 7416—18, 6812–14. For these reasons, the appropriate remedy is to grant a COA on this claim and remand to the district court for an evidentiary hearing.

## II. The Court should grant a COA on the IATC claim.

### A. Cruz-Garcia alleged a substantial claim.

To establish ineffective assistance of trial counsel in violation of the Sixth Amendment, a petitioner must show that counsel performed deficiently, and that counsel's deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Cruz-Garcia alleged a substantial IATC claim based on numerous failures at all stages of trial and resulting in prejudice. ROA.3501–637.

Under clearly established federal, "counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case." *Strickland*, 466 U.S. at 690. Clearly established federal law emphasizes that counsel's performance must be

evaluated "considering all the circumstances." *Id.* at 688. Here, those circumstances include trial counsel billing the equivalent of the Harris County capital trial fee in *other* cases during Cruz-Garcia's trial. *See* Facts II.A–L. The picture which emerges from trial counsel's billing records is disturbing in the midst of a capital murder trial, counsel was appearing in court in other cases on all but one of the days during which the jury heard evidence as well as billing substantial time to other cases *every* day. ROA.3539–3548. These circumstances make clear that "their failure to investigate thoroughly stemmed from inattention, not strategic judgment." *Wiggins v. Smith*, 539 U.S. 510, 526 (2003).

### 1.    Failure to retain a DNA expert.

Trial counsel performed deficiently by failing to consult with a DNA expert despite red flags that the evidence was unreliable. DNA was critical to the State's case as the only forensic evidence tying Cruz-Garcia to the assault. Questions about the reliability of the DNA evidence were obvious from the fact that it had been processed by incompetent analysts at the discredited HPD Crime Lab. As such, Cruz-Garcia's prior counsel had retained a DNA expert. ROA.1696–97.

Cruz-Garcia was prejudiced by the failure to retain a DNA expert. In his post-conviction affidavit, Cornelius brushed this allegation aside on the ground that he knew "a lot" about DNA evidence, without acknowledging the State's admission that its DNA analysis was flawed. ROA.15116. A DNA expert would have determined that the State's DNA analysis did not conform to testing guidelines and yielded unsupported results. A DNA expert would have identified the State's erroneous inclusion of Arturo as a possible contributor to DNA on the underwear. Orchid Cellmark failed to do "a statistical calculation on th[e] DNA mixture." ROA.14391. Because the DNA from the underwear was "only detected in four of fifteen DNA loci and at a very low level" it was "impossible to obtain a statistical weight." ROA.14392. As a result, there was "insufficient information for a laboratory to conclude that Arturo Rodriguez may have been the second contributor," and the comparison should have been reported as "inconclusive," *id.* as the State later did in its post-trial amended DNA report. ROA.785–87.

A DNA expert would also have shown that the State's DNA analysis with respect to the vaginal swab was also flawed. Orchid Cellmark also used two different statistical analyses of the contributors to the vaginal

swab, one for Cruz-Garcia and another for Arturo. ROA.14393. That is, after including Arturo as a possible contributor, "the statistics were changed for the subsequent inclusion of Obel Cruz-Garcia." *Id.* Additionally, although Orchid Cellmark generated the DNA profile and identified possible contributors, the HPD analyst subsequently reinterpreted those DNA profiles before reaching her own conclusions regarding possible contributors. ROA.14393–94. In doing so, she excluded a DNA marker that had been included by Orchid Cellmark and included additional DNA loci. *Id.* This violated "scientific best practice" and "accreditation standards," and led to an inappropriate "adjustment to the statistical interpretation." ROA.14393–95.

In short, a DNA expert would have established what the State would later admit: its DNA analysis was flawed and there was at least one unknown contributor to the DNA on the underwear and the vaginal swab. *Id.*

> ### 2. Failure to investigate and challenge future dangerousness.

Trial counsel performed deficiently by failing to investigate or present any rebuttal to the State's case on future dangerousness. Cornelius agreed that they had conceded future dangerousness, but

dismissed this failure on the assumption that because the State sought the death penalty against Cruz-Garcia, it must have built an insurmountable case for future dangerousness. ROA.15118. Trial counsel thus abandoned one of two defenses to the death penalty based entirely on an assumption untethered from any investigation of the State's evidence. Counsel thus performed deficiently. *Wiggins*, 539 U.S. at 523.

Cruz-Garcia was prejudiced. By counsel's own admission, they did not conduct any investigation into the future dangerousness special issue despite significant and available evidence to rebut the State's case. Trial counsel failed to obtain any of Cruz-Garcia's prison records from Puerto Rico, establishing that he received just a single disciplinary offense and had since become a trusted inmate who led religious services and Bible study, counseled other inmates and helped them improve their conduct, was permitted to work with power tools, was allowed to move about the facility freely, and maintained an otherwise spotless prison record. ROA. 14923–29, 14533–36, 14543–45, 14551–53, 14561–64, 14570–72. Yet, some of these records were in the State's open file. ROA.14230.

Trial counsel also failed to investigate the murder of Saul Flores. *See, supra,* Facts I.K. Had counsel investigated, they could have shown

through the testimony of Elizabeth Ramos that Santana's story about Cruz-Garcia purportedly murdering Flores was fabricated. Trial counsel also failed to impeach Johnny with his own prior 1989 inconsistent statement, in which he identified a different individual as the perpetrator both in his statement and a photo lineup. The jury was thus left with the incorrect impression that Johnny had always believed Cruz-Garcia to be the perpetrator.

### 3. Failure to investigate State witnesses.

Trial counsel failed to investigate evidence of Diana and Cruz-Garcia's consensual relationship. Based on Diana's statement that one of the assailants sexually assaulted her, the DNA appeared to link Cruz-Garcia to the time and place of Angelo Garcia's disappearance. Trial counsel, however, failed to investigate and present substantial evidence that Cruz-Garcia and Diana had a consensual sexual relationship. Specifically, several friends of Diana and Cruz-Garcia could and would have testified that it was well known that they maintained a consensual sexual relationship. ROA.14574, 14579, 14588. Cesar Rios, and his brothers Hector Saavedra and Jose Valdez, knew Garcia and Cruz-Garcia well and could have testified that they had a consensual sexual

relationship. Notably, Cesar was identified in police reports as a known associate of Cruz-Garcia and recalled having briefly been contacted by the defense but he was not followed up with. ROA.14575. Indeed, the investigator's billing records reflect that the bulk of trial counsel's efforts to locate witnesses occurred during jury selection and while Cornelius continued to bill substantial time to other cases. *See* ROA.1744–49.

Cruz-Garcia was prejudiced. Together with a DNA expert, evidence that Diana and Cruz-Garcia had a consensual sexual relationship would have explained the presence of his DNA and thus prevented the State from arguing to the jury that he must have been one of the assailants on the night of Angelo's disappearance. *See* ROA.11905.

Trial counsel also failed to investigate Santana. Cornelius admitted that he did not know whether the victim of Santana's child-assault case was a boy or a girl. ROA.11623–24. Trial counsel also failed to investigate Santana's long history of mental illness, which Santana himself told a federal district court was supported by a "plethora" of medical records. Counsel could have impeached Santana and undermined the reliability of his testimony.

### 4. Failure to retain a mitigation specialist and conduct an adequate mitigation investigation.

Despite conceding future dangerousness, trial counsel also did not retain a mitigation specialist and conduct an adequate mitigation investigation. The defense's entire penalty case relied on just four lay witnesses and lasted less than one day. *See* Facts II.L. On that day, Cornelius billed 5.5 hours to *other* cases and made a court appearance in yet another case. ROA.3547. A wealth of mitigation evidence uncovered in post-conviction makes clear that "effective counsel would have painted a vividly different tableau of aggravating and mitigating evidence than that presented at trial." *Andrus v. Texas*, 590 U.S. 806, 821 (2020).

Trial counsel sought to explain away the failure to retain a mitigation specialist on the ground that mitigation specialists "refused to take cases for the money that the County was willing to pay." ROA.15119. Cornelius's billing records, however, reveal otherwise. In the Jeffrey Prevost death penalty case,[11] he employed a mitigation specialist

---

[11] A Harris County state habeas court recently recommended that relief be granted to Prevost based on Cornelius's ineffective assistance. Trial Court's Findings of Fact, Conclusions of Law, and Recommendation, *Ex parte Jeffery Prevost*, WR-84,068-01, Trial court Cause No. 1414421-A (351st Judicial District Court, Harris County). That recommendation was based, *inter alia*, on Cornelius's testimony that the ABA Guidelines are "basically ridiculous", and he does not "pay any attention to them at all." *Id.* Reporter's Record Vol. 13 at 9. Cornelius died in October 2023.

beginning in September 2012, nine months before Cruz-Garcia's trial, who was based in Houston, and worked for the county rate. ROA.5199.

Had trial counsel retained a mitigation specialist and conducted an objectively reasonable mitigation investigation, trial counsel would have uncovered a wealth of mitigation evidence. Numerous witnesses were available and willing to testify that Cruz-Garcia grew up in the Dominican Republic in extreme poverty and was abandoned by his mother. ROA.14450, 14451–52, 14508–09, 14518–19. These witnesses would have also told the jury that Cruz-Garcia emigrated to Puerto Rico, and then on to Houston, as a young adult to escape from poverty and provide for better opportunities for his young family. ROA.14452, 14464, 14479, 14499. Witnesses would have told the jury that, when Cruz-Garcia returned to Puerto Rico and the Dominican Republic, he provided financial support to his family. ROA.14480, 14500, 14509. Finally, a reasonable investigation would have revealed that Cruz-Garcia provided assistance to federal law enforcement. ROA.14453, 2693–707.

Trial counsel's affidavit did not contest many of the failures detailed here, but instead showed a repeated reliance on general assumptions untethered from the specifics of Cruz-Garcia's case. In his post-conviction

affidavit, Cornelius stated that they did not retain a DNA expert because "I do know a lot about DNA evidence," did not investigate or challenge future dangerousness because "I have not won a case on the future dangerousness question, or seen it done," and did not retain a mitigation specialist because they "had my experience." ROA.15116, 15118, 15119.

Many of Cruz-Garcia's allegations of ineffectiveness are therefore not a matter of degree. Instead, the question is whether counsel can abandon critical and available defenses prior to conducting any investigation into them, including into the State's case for guilt—DNA evidence and the State's star witness—and the death penalty—future dangerousness. Clearly established federal law makes clear that the answer is a resounding "no." *See Wiggins*, 539 U.S. at 523 (explaining that the relevant IATC question "is not whether counsel should have presented [evidence]" but instead "whether the investigation supporting counsel's decision not to . . . *was itself reasonable*.") (emphasis in original).

### B. Reasonable jurists could debate the district court's procedural adjudication.

The district court held that Cruz-Garcia was required to overcome both § 2254(d) *and* establish cause and prejudice as to different portions

of his single IATC claim. ROA.6542. Circuit precedent, however, does not support this dual burden.

### 1. The district court erred in requiring Cruz-Garcia to establish both that § 2254(d) was met and cause and prejudice.

The district court required that Cruz-Garcia both overcome §2254(d) as to allegations made in his initial state habeas application and establish cause and prejudice as to allegations raised in the post-*Rhines* state successor only. ROA.6542. The district court's reasoning, however, is not supported by AEDPA's framework or this Court's precedent. Under AEDPA's framework, *either* a claim has been adjudicated on the merits and is therefore subject to § 2254(d) *or* a claim was not adjudicated on the merits and cause and prejudice must be established to excuse procedural default. *Nelson v. Lumpkin*, 72 F.4th 649, 656 (5th Cir. 2023). To require both that § 2254(d) be met and that cause and prejudice be established—as the district court did—would require the untenable conclusion that a claim was both adjudicated on the merits and is procedurally defaulted.

Circuit precedent likewise does not support chopping up a claim for the purpose of applying § 2254(d) to certain allegations within an IATC

claim and procedural default to others. *Nelson*, 72 F.4th at 659. The district court thus erred in requiring both that Cruz-Garcia overcome § 2254(d) and establish cause and prejudice within his single IATC claim. Based on this Circuit's recent precedent in *Nelson*, Cruz-Garcia must overcome the relitigation bar under § 2254(d) as to his IATC claim because it includes allegations also raised in state habeas. Under Supreme Court precedent that review is limited to the state court record, *Pinholster*. 563 U.S. at 181. If § 2254(d) is met, the doctrine of procedural default is not applied then to the remainder of that claim.

## 2. Reasonable jurists could debate the district court's § 2254(d) adjudication.

The district court held that allegations 4F1, 4F4, 4F5, 4G3, 4G1, 4G2, 4K, and 4I of Cruz-Garcia's IATC claim were subject to § 2254(d) and that the relitigation bar was not met. ROA.6542–43. Reasonable jurists could, however, debate this conclusion.

Under § 2254(d), a federal habeas court defers to a state court adjudication on the merits of a claim unless the state court decision was "(1) 'contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States'; or (2) 'resulted in a decision that was based on an

unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Gray v. Epps*, 616 F.3d 436, 439 (5th Cir. 2010) (quoting §§ 2254(d)(1)–(2)). Only one exception to the relitigation bar need be present. Where the relitigation bar is met, a federal court may review the merits *de novo* and based on all evidence put forth by the petitioner. *See Brumfield v. Cain*, 576 U.S. 305, 311 (2015).

The district court does not appear to have engaged with arguments made in federal pleadings that § 2254(d) was met. The district court's § 2254(d) assessment focuses entirely on the state habeas petition and corresponding findings of fact and conclusions of law, with no discussion of arguments made by Cruz-Garcia in federal court. Section 2254(d), however, does not invite independent review confined to the state court pleadings by a federal court. Whether § 2254(d) can be overcome is a federal law question both Cruz-Garcia and the Respondent argued in their federal filings. *See* ROA.6388–410,

### i. *Failure to retain a DNA expert (section 4F1).*

The district court held that the state habeas court was not unreasonable in finding no deficient performance because trial counsel was familiar with DNA evidence and "[w]ith that familiarity, trial

counsel formulated a strategy that did not require the assistance of a DNA expert." ROA.6547. But trial counsel's supposed proficiency in DNA evidence is belied by the State's partial recantation of its own DNA analysis. *See* ROA.14912–15. The trial court, however avoided any discussion of those findings. It also did not, as the district court notes, discuss the state habeas expert's similar findings. ROA.6546.

The district court also erred in its § 2254(d) analysis by going beyond trial counsel's own statements and positing that the failure to retain a DNA expert resulted from "a strategy that did not require the assistance of a DNA expert." ROA.6547. Trial counsel made plain in his affidavit that the failure to retain a DNA expert had nothing to do with strategy and was based entirely on his self-professed expertise. ROA.15119.

"Criminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence, whether pretrial, at trial, or both." *Richter*, 562 U.S. at 106. In light of the critical nature of the DNA evidence here, this is such a case. Additionally, in conducting its § 2254(d) analysis, the district court was required to "train its attention on the particular reasons—both

legal and factual—why state courts rejected [Cruz-Garcia's] federal claims," not invent other rationales to support the state court judgment. *Wilson v. Sellers*, 584 U.S. 122, 125 (2018) (internal quotations omitted).

The state habeas court's findings and conclusion were both an unreasonable application of *Strickland* and its progeny under §2254(d)(1) and an unreasonable application of the facts under § 2254(d)(2). *See Elmore v. Ozmint*, 661 F.3d 783, 859 (4th Cir. 2011) (state court was unreasonable in concluding that trial counsel's failure to investigate forensic evidence was not deficient performance).

The district court also concluded that it was not unreasonable for the state habeas court to find no *Strickland* prejudice concerning the DNA evidence because "Cruz-Garcia's arguments were similar to those trial counsel had raised[.]" ROA.6547. But that cannot be, as Cruz-Garcia's arguments were based on expert opinion, which is precisely what trial counsel failed to obtain. Furthermore, a DNA expert would have identified that the picture presented by the State was inaccurate, as was indeed confirmed by the State's 2015 amended report.

The district court further concluded that it could not consider what it described as "new evidence"—without citation— in assessing whether

§ 2254(d) was met. ROA.6545. To the extent that evidence is the State's 2015 recantation, ROA.785–87, the district court was mistaken. The amended DNA analysis was made a part of the initial state habeas proceeding by the State. ROA.14832, 14912–15. Even if that were not the case, the § 2254(d) analysis should account for that recantation and the State's amended DNA report.

### ii. Failure to investigate and challenge future dangerousness (section 4G3).

In trial counsel's words, they made no attempt regarding the future dangerousness special issue. ROA.15117–18. But clearly established federal law is clear that this cannot be reasonable:

> Only after a jury makes a finding of future dangerousness can it consider any mitigating evidence. Thus, by failing to conduct even a marginally adequate investigation, counsel not only seriously compromised his opportunity to respond to a case for aggravation, but also relinquished the first of only two procedural pathways for opposing the State's pursuit of the death penalty. There is no squaring that conduct, certainly when examined alongside counsel's other shortfalls, with objectively reasonable judgment.

*Andrus*, 590 U.S. at 821 (internal quotes omitted). Trial counsel may not—as trial counsel did here—simply forego a critical penalty issue absent any investigation.

The district court recites at length the numerous allegations brought by the State against Cruz-Garcia, ROA.6560, but trial counsel themselves did not justify their complete abandonment of the future dangerousness special issue on these grounds. A reviewing court may not substitute its own post hoc rationalization where trial counsel has provided their own reasons, however paltry they may be. *Richter*, 562 U.S. at 109 ("[C]ourts may not indulge in '*post hoc* rationalization' for counsel's decisionmaking that contradicts the available evidence of counsel's actions[.]") (quoting *Wiggins*, 539 U.S. at 526–27).

The district court opined that counsel "used his experience and expertise to conclude that the evidence, including evidence of Cruz-Garcia's violent past, meant that the defense was 'not going to win on future danger.'" ROA.6557. But trial counsel did not investigate any of that evidence or attempt to develop any countervailing evidence, and instead took the State's evidence at face value. *See Wiggins*, 539 U.S. at 523 (explaining that the relevant question is whether trial counsel's investigation was reasonable). The complete lack of investigation further belies the district court's contention that "defense counsel reasonably decided not to jeopardize his credibility before the court and the jurors

with easily refuted arguments about good behavior during incarceration." ROA.6561. *Soffar v. Dretke*, 368 F.3d 441, 474 (5th Cir. 2004) ("[A]n actual failure to investigate cannot be excused by a hypothetical decision not to use its unknown results.").

Prejudice is clear: counsel abandoned one of two defenses to the death penalty despite ample available evidence. Cruz-Garcia's "prison record was clearly relevant to the issue of future dangerousness." *Moore v. Johnson*, 194 F.3d 586, 621 (5th Cir. 1999). As reflected *supra*, Facts I.G, a wealth of evidence could have been presented to the jury to rebut the State's case on future dangerousness.

### iii. *Failure to investigate State witnesses (sections 4F4–5).*

Trial counsel failed to investigate the relationship between Cruz-Garcia and Diana. The district court concluded that Cruz-Garcia could not overcome § 2254(d) because "by refusing to help his attorneys, Cruz-Garcia can prove counsel's ineffectiveness only by pointing out independent leads that a reasonable attorney could have followed without his information or cooperation." ROA.6552. Cruz-Garcia, however, did identify leads which the defense team acknowledged they were aware of but nevertheless failed to pursue. Police reports from 1992

described Rios as a known associate of Cruz-Garcia. *See* ROA.15132. As a result, trial counsel's investigator knew that Rios was an important witness to interview. The district court also relied partly on the fact that the DNA evidence showed only the presence of Cruz-Garcia and Arturo's DNA and so evidence of a consensual relationship would not contradict the rape accusation. ROA.6554. As set out above, however, a DNA expert could have shown the State's DNA analysis was flawed. Additionally, the DNA evidence as corrected by the State does reflect the presence of an unknown individual. Its § 2254(d) analysis should accordingly account for that revised evidence. *See Pinholster*, 563 U.S. at 213 n.5 (Sotomayor J., dissenting).

### iv. *Failure to retain a mitigation specialist and conduct an adequate mitigation investigation (sections 4G1–2).*

Trial counsel did not retain a mitigation specialist and planned to present just three witnesses at the penalty phase. A fourth witness testified in support of Cruz-Garcia after hearing about the trial on tv and contacting trial counsel to ask to testify. ROA.12404. The district court concluded that Cruz-Garcia could not overcome § 2254(d) because his allegations are weaker than those made in cases in which the Supreme

Court found deficient performance. ROA.6564–65. But the evaluation of whether trial counsel provided ineffective assistance of counsel has never required that a petitioner demonstrate that he adduced the same evidence as that proffered in cases in which a court found ineffective assistance of counsel as to the mitigation issue. *Andrus*, 590 U.S. at 823 n.6. Regardless, and contrary to the district court's contention that he did not present any "disturbing fact," Cruz-Garcia did adduce evidence of: child labor, childhood trauma, and childhood abandonment by his mother. ROA.3585–98, 14450, 14489, 14508–09, 14518, 14452, 14464, 14479, 14499.

The district court further reasoned that it was reasonable for counsel to not introduce mitigating evidence because "this evidence would have heightened the inconsistency with the ample evidence of his violent, unlawful, past acts." ROA.6565. But that is precisely the role and value of mitigating evidence under the Texas capital sentencing framework, which asks the jury to weigh and contrast the State's evidence against mitigating evidence. Such evidence would have "heightened the inconsistency" with the State's future dangerousness case and thus provided the jury with factors to weigh against that case.

Finally, the district court's relies on the state habeas court's emphasis on the "overwhelming evidence" of future dangerousness. ROA.6566–67. This reasoning, however, only serves to underscore trial's ineffectiveness in abandoning the future dangerousness special issue. Counsel and the state habeas court cannot both point to the State's case on future dangerousness as reason to entirely abandon that issue to focus on mitigation while also arguing that mitigation was futile because of the State's case on future dangerousness.

Reasonable jurists could debate the district court's adjudication of § 2254(d). This Court should therefore grant COA on Cruz-Garcia's IATC claim.

## III. The Court should grant COA on the complete defense claim.

### A. Cruz-Garcia alleged a substantial claim.

Cruz-Garcia made a substantial showing that he was denied the due process right to present a complete defense. "[T]he Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (internal quotations omitted). A trial court's application of state evidentiary rules may violate a defendant's right to present a complete defense where "[t]he exclusion of evidence . . . significantly undermined

fundamental elements of the defendant's defense." *United States v. Scheffer*, 523 U.S. 303, 315 (1998); *Kittelson v. Dretke*, 426 F.3d 306, 320–21 (5th Cir. 2005). Cruz-Garcia's right to present a complete defense was violated by the trial court's exclusion of evidence concerning the unreliability of the State's DNA evidence.

Critical to the State's case was DNA evidence that tied Cruz-Garcia to the sexual assault of Diana Garcia and thus corroborated Santana's testimony. ROA.11858. At trial, Cruz-Garcia sought to introduce evidence and witness testimony detailing the HPD Crime Lab's mishandling of DNA evidence and of disciplinary sanctions and criminal convictions against several of the DNA technicians who processed and stored the DNA evidence in the case. ROA.12885–13713 (Def. Exs. 2–18). Notably, Cruz-Garcia sought to introduce evidence that the DNA Section of the lab had been shuttered after it was found to be operating "under conditions that made the risk of an injustice intolerably high." ROA.13224. That 2002 closure resulted from an independent audit, which uncovered that the DNA Section was "in shambles[.]" ROA.12911. The Bromwich reports, which resulted from a years-long investigation of

the HPD Crime Lab and led to its eventual closure, corroborated these findings. ROA.13036–13058.

Trial counsel specifically requested to: admit the Bromwich Reports; employee complaint histories for Baldev Sharma; the HPD Internal Affairs Investigation summary reflecting that. Sharma was demoted "for violations of Competence and Truthfulness"; and a judgment of conviction against Deetrice Wallace for tampering with a government record. ROA.12844–13659, 13660–79, 13681–86, 13705–07, 13708–710, 13711–13. The defense further sought to call independent investigator Michael Bromwich to testify to his findings. ROA.10954. The defense also sought to introduce evidence that the DNA evidence had been tested by another third-party lab, Genetic Design, in 1993 which yielded different results. ROA.13716–66.

The trial court held that such evidence was "not admitted, not to be mentioned or alluded to or discussed, because it is irrelevant." ROA.10914. This ruling prohibited Cruz-Garcia from utilizing this critical information and his right to present a complete defense. *See Holmes*, 547 U.S. at 324. This right is violated where a trial court excludes "competent, reliable evidence bearing on the credibility" of

evidence that is key to a defendant's defense. *Crane v. Kentucky*, 476 U.S. 683, 690 (1986). Hence, even an evidentiary rule "which has long been recognized and respected by virtually every State" must sometimes yield to a defendant's right to present a defense. *Chambers v. Mississippi*, 410 U.S. 284, 298 (1973) (finding that defendant's right to present a defense was violated by application of hearsay rule to preclude evidence going to the credibility of a defendant's confession). Cruz-Garcia has raised a substantial claim that this right was violated here.

## B. Reasonable jurists could debate the district court's holding that the claim was adjudicated on the merits by the state court.

Cruz-Garcia argued that the district court could review the complete defense claim *de novo* because it was not adjudicated on the merits by the state court. ROA.3491–93 (citing *Johnson*, 568 U.S. at 298). The question of whether a federal constitutional claim has been adjudicated on the merits for the purpose of applying § 2254(d) may arise, for example, where the state court "issues an opinion that addresses some issues but does not expressly address the federal claim in question." *Johnson*, 568 U.S. at 292. Where a state court failed to adjudicate the federal claim on the merits, "§ 2254(d) entitles the prisoner to an

unencumbered opportunity to make his case before a federal judge." *Id.* at 303.

The district court agreed that Cruz-Garcia had raised this claim on direct appeal, ROA. 6533, and that the CCA "did not refer to the complete defense argument" in adjudicating this point of error. ROA.6534. It nevertheless rejected Cruz-Garcia's argument for *de novo* review based on two facts. First, "the Court of Criminal Appeals 'overruled' Cruz-Garcia's point of error, indicating that it intended to dispose of the entire claim." ROA.6535. A claim is not adjudicated on the merits, however, simply because the state court adjudicated *a* claim. Here, as explained by the district court, the CCA adjudicated and overruled a Confrontation Clause claim. ROA.6533–34. But it did not adjudicate the complete defense claim also raised by Cruz-Garcia. Adjudication as to the Confrontation Clause claim does not necessitate that the CCA adjudicated the complete defense claim.

Second, "the Court of Criminal Appeals used language invoking the constitutional right to present a meaningful defense." ROA.6535. That language, however, was followed by a citation to a separate section of the CCA's order about an entirely distinct claim. ROA.7554 at n.29 (citing

Part III.A). That section concerned the trial court's exclusion of mitigating evidence at the penalty phase. ROA.7571. The Supreme Court has made clear that "on the merits" under § 2254(d) requires that the state court have actually engaged with a petitioner's arguments. *Johnson*, 568 U.S. at 302–03. Here, the state court merely footnoted to a section concerning entirely different evidence and substantive arguments arising from a different phase of trial. In *Johnson* itself, the Supreme Court contemplated that the presumption may be rebutted where—as here— the adjudication "was simply mentioned in passing in a footnote." *Id.* at 301. In short, reasonable jurists could debate both reasons given by the district court based on *Johnson* itself.

## C. Reasonable jurists could debate the district court's adjudication that the claim is meritless.

The district court also held that this claim was meritless whether under deferential or *de novo* review because "[t]he State did not present DNA evidence directly resulting from the old HPD crime lab." ROA.6536. That statement, however, is inaccurate. Whereas the DNA analysis introduced at trial was produced by a different lab, the evidence from which that analysis was made were processed and stored by the HPD Crime Lab. Both of these critical steps were identified by independent

investigations as areas of concern bearing on the reliability of DNA evidence passing through the HPD crime Lab, including by Sharma, who had "no experience in forensic science" and "weak[]" skills, and by Wallace, who was convicted of tampering with records relating to her work in another case. ROA.12934, 1935, 13709—10. The trial court, however, excluded any report, testimony, and even allusion to the HPD crime lab despite a clear link between the State's DNA evidence and the HPD crime lab. ROA.10914.

Reasonable jurists could debate the district court's rejection of *de novo* review and adjudication of the substantive constitutional claim as meritless. This Court should therefore grant COA on Cruz-Garcia's complete defense claim.

Respectfully submitted,

JASON D. HAWKINS
Federal Public Defender

*/s/ Jeremy Schepers*
Jeremy Schepers
Supervisor, Capital Habeas Unit
jeremy_schepers@fd.org

*/s/ David Currie*
David Currie
Assistant Federal Public Defender
david_currie@fd.org

*/s/ Naomi Fenwick*
Naomi Fenwick
Assistant Federal Public Defender
Naomi_fenwick@fd.org

Office of the Federal Public Defender
Northern District of Texas
525 South Griffin Street, Suite 629
Dallas, Texas 75202
214.767.2746
214.767.2886 (fax)

## CERTIFICATE OF SERVICE

I hereby certify that on July 29, 2024, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Fifth Circuit using the CM/ECF system.

*/s/ Jeremy Schepers*
Jeremy Schepers

## CERTIFICATE OF COMPLIANCE

I certify that (1) this document was prepared in 14-point Century Schoolbook font using Microsoft Word software, (2) this document is 15,486 words, excluding the portions exempted by the rules of this Court, and (3) this document has been scanned for viruses and is virus-free. Counsel further certifies that any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13.

*/s/ Jeremy Schepers*
Jeremy Schepers